1   JODI LINKER
    Federal Public Defender
2   Northern District of California
    KARTHIK RAJU
3   Assistant Federal Public Defender
    19th Floor Federal Building - Box 36106
4   450 Golden Gate Avenue
    San Francisco, CA 94102
5   Telephone:   (415) 436-7700
    Facsimile:   (415) 436-7706
6   Email:       Karthik_Raju@fd.org

7

8   Counsel for Defendant Aguilar

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14   UNITED STATES OF AMERICA,          **Case No.:** CR 22–365 CRB

15              Plaintiff,              **DEFENDANT'S SENTENCING
                                        MEMORANDUM**
16          v.
                                        **Court:**         Courtroom 6, 17th Floor
17   JOSE AGUILAR,                      **Hearing Date:**   January 31, 2024
                                        **Hearing Time:**   10:00 a.m.
18              Defendant.

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2       Jose Aguilar is a 25-year-old gentleman who came to the United States from Honduras in 2017.

3  He has never been previously deported. Mr. Aguilar is now before the Court for sentencing on

4  January 31.

5       The social, economic, and political conditions in Honduras have created an environment in

6  which an exceptional part of the country's population lives in hopeless poverty and in fear of

7  endemic violence. It was after recognizing that he had virtually no opportunity to provide for himself

8  or to support his family that Mr. Aguilar embarked on the hazardous journey to the United States. Mr.

9  Aguilar has one prior criminal conviction from the state of Washington, for which he served a 15-

10  month sentence before he was transported to this district to appear on the warrant on this case. For the

11  street-level drug activity he engaged in, he is subject to near-certain deportation back to Honduras, he

12  is ineligible for several avenues of relief in immigration proceedings, and he is forever banned from

13  admission into the United States.

14       Mr. Aguilar takes responsibility for his actions and understands that he must face consequences

15  for his conduct. He accepted responsibility by timely pleading guilty, and he respectfully requests

16  that the Court impose sentence on January 31. Following Mr. Aguilar's completion of the

17  Washington state sentence, he was immediately transferred to federal custody in January 2023. To

18  date, he has served the equivalent of a 14-month prison sentence on this case.

19       Mr. Aguilar therefore respectfully asks that the Court impose a sentence of time-served to be

20  followed by three years of supervised release and a stay-away order from the Tenderloin. Moreover,

21  Mr. Aguilar respectfully requests that the Court decline to order preparation of a Presentence Report

22  pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A)(ii). Mr. Aguilar submits that the

23  information contained herein allows the Court to meaningfully exercise its sentencing authority under

24  18 U.S.C. § 3553.

25

26

**ARGUMENT**

27  **I.    A Sentence Of Time Served Would Be Sufficient But Not Greater Than Necessary To
       Achieve The Sentencing Goals Of § 3553(a)**

28

In sentencing Mr. Aguilar, this Court must consider all the directives set forth in 18 U.S.C. §

1    3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United*

2    *States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The

3    overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than

4    necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.

5    2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the

6    offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford

7    adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant;

8    and (6) provide the defendant with needed educational or vocational training, medical care, or other

9    correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also

10    directs the Court to consider a number of additional factors, including: the nature and circumstances

11    of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds

12    of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent

13    Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing

14    disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, §

15    3553(a)(7).

16         **A.**     **The nature and circumstances of the offense**

17         On July 27, 2021, pursuant to information acquired by listening to intercepted calls between

18    Mr. Aguilar and Mr. Roger Arteaga, a higher-ranking member of the conspiracy, agents believed Mr.

19    Aguilar arranged to purchase one kilogram of fentanyl from Arteaga. Agents surveilled the location

20    where the transaction was to take place. They observed Mr. Aguilar enter Arteaga's car carrying an

21    unweighted bag. They saw Mr. Aguilar exit Arteaga's vehicle two minutes later. Shortly thereafter,

22    agents effected a traffic stop on Mr. Aguilar's vehicle. He was the only person in the car. Agents

23    searched Mr. Aguilar's vehicle and located the bag they had observed him carrying earlier. It

24    contained 1184 grams (gross) of a substance containing fentanyl.

25         Three weeks prior, on July 7, 2021, agents intercepted a phone call between Mr. Aguilar and

26    Arteaga where they agreed to meet later that day for Arteaga to sell fentanyl to Mr. Aguilar. Agents

27    did not surveil or observe the transaction.

28         On September 30, 2022, the grand jury returned an indictment charging Mr. Aguilar with two

counts:[1]

Count #2 - 21 U.S.C.§§ 846, 841(a)(1), (b)(1)(B) – Conspiracy to distribute and possessing with the intent to distribute a substance containing 40 grams or more of fentanyl between July 7, 2021 and July 27, 2021; and,

Count #3 - 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi) – Possessing with intent to distribute 40 grams or more of a substance containing fentanyl on July 27, 2021.

Mr. Aguilar pleaded guilty to both counts without a plea agreement before Your Honor on January 10, 2024. The sentence range for his plea is between 5 and 40 years pursuant to 21 U.S.C. 841(a), (b)(1)(B). The Court has discretion to order a fine up to 5 million dollars. The base offense level pursuant to USSG §2D1.1(a)(5), (c)(4), is 32. Accounting for acceptance of responsibility and satisfaction of the safety valve,[2] his total adjusted offense level is 29. Mr. Aguilar falls into Criminal History Category II based on the one prior conviction. The resulting advisory Guidelines range is 97–121 months. The government's plea offer contained the exact same calculations.

Mr. Aguilar intended to engage in street-level sales with the fentanyl he purchased from Arteaga. Indeed, Mr. Aguilar is described by a special agent as a "street-level dealer" in an affidavit filed with the court. He understands that circulating these substances, particularly fentanyl, can have serious and tragic consequences. It was never his intention to harm anyone. The government will likely point out that fentanyl and resulting overdoses have become a widespread and extremely concerning problem throughout the Bay Area in the past several years. Mr. Aguilar does not disagree with that premise nor does he minimize the severity of his own conduct in selling fentanyl. But it is important to also consider the reality of his relative culpability in the context of the broader fentanyl and opioid epidemic. Speaking bluntly, Mr. Aguilar was a low-level dealer who sold drugs on the street. He did not choose the type of drug that users would want or ask him to obtain. He was not responsible for determining which drugs would be imported into or manufactured in the United States

---

[1] Miriam Rosales Avila, charged in the same indictment as Mr. Aguilar, was indicted on one count of violating 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(C). The indictment alleges her participation in the conspiracy between July 7, 2021 through October 15, 2021. She has not been arrested.

[2] Mr. Aguilar submitted a written proffer to the government on the date of this filing in accordance with *United States v. Mejia-Pimental*, 477 F.3d 1100 (9th Cir. 2007). He is safety valve eligible. The Washington assault prior does not qualify as a crime of violence per *United Staes v. Robinson*, 869 F.3d 933 (9th Cit. 2017).

DEF'S SENT. MEM.
*AGUILAR*, CR 22–365 CRB

for sale. As a low-level dealer, the larger factors of what particular drug happened to be in vast supply and/or demand at any given point in time were not within his control. Mr. Aguilar sold fentanyl because that is what was widely available and what buyers asked for.

To be sure, Mr. Aguilar is deeply remorseful for his conduct. He conveyed that he understands the blight that fentanyl has caused in San Francisco and across the nation. He recognizes the devastating effects that attend fentanyl addiction, and his role in enabling others' use. Mr. Aguilar appreciates the potency and possibility of death resulting from ingestion of even a small amount of fentanyl. Whereas he previously behaved immaturely and without care for the health and well-being of others, he now understands his conduct was dangerous and wrong, full stop.

Without reservation and with sincere contrition, Mr. Aguilar apologizes to the Court and the people his conduct has affected.

**B.      The history and characteristics of Mr. Aguilar**

1. Mr. Aguilar's Criminal Record

Mr. Aguilar entered the United States without inspection in 2017 at the age of 18. Just months before his 'successful' entry into the United States, Mr. Aguilar attempted to enter the country at a bona fide border crossing, but he was denied entry. Mr. Aguilar is similarly situated to virtually all Honduran clients prosecuted for local drug sales - he left Honduras out of desperation and with the hope that in America he would find a steady job, raise a family, and be able to send leftover earnings to his mother and father in Honduras. Like others who fled the despair in Honduras, Mr. Aguilar's plan was never to come to the United States and sell drugs.

Since coming to America, Mr. Aguilar lived most of the time in Oakland. But he resided in Seattle, Washington for several months in 2021. There, he was arrested on October 23, 2021 for assault and for possessing controlled substances for distribution. The drug charges were dismissed when Mr. Aguilar pleaded guilty to the assault, for which the court sentenced him to a term of 15 months in state prison. Mr. Aguilar admitted to assaulting the victim several times with a knife. The injuries caused the victim, a stranger, to need immediate medical treatment at the hospital. Following the incident, Officers located Mr. Aguilar's car. In it, they found a number of controlled substances, a firearm, and approximately $41,000 in cash. That Mr. Aguilar accepts full responsibility for his

1  actions in that case is demonstrated by his pleading guilty before trial and accepting a state prison
2  sentence. When that 15-month sentence was satisfied, Mr. Aguilar was immediately turned over to
3  federal custody to appear on this case. Thus, he has been in continuous custody since October 23,
4  2021. Mr. Aguilar has conveyed his total remorse for the Washington conduct - he ascribes it in part
5  to being intoxicated by drugs at the time of incident. Indeed, Mr. Aguilar became a heavy cocaine
6  user following his entry to the United States. While the incident was serious, Mr. Aguilar received a
7  substantial sentence for a first-time offender.

8      After entering the United States in 2017, Mr. Aguilar immediately traveled to Oakland. His
9  cousin resided there, and Mr. Aguilar lived with him for three-years. For several months following his
10 entry, Mr. Aguilar worked helping an auto mechanic and earned $19 per hour. The job only lasted two
11 months. A Honduran friend then introduced him to the drug trade, and Mr. Aguilar learned of the
12 particular demand for fentanyl in San Francisco. At the time, Mr. Aguilar did not fully appreciate the
13 devastation the drug caused. He states that he certainly does now.

14     The defense notes that Mr. Aguilar was arrested once in 2017 and once in 2018 for possession
15 of controlled substances for distribution. He successfully completed diversion on one of those cases,
16 and both cases were dismissed by the San Francisco District Attorney.

17              2. Mr. Aguilar's personal background

18     Mr. Aguilar was 23 at the time of this incident. Certainly, he was not a child. However, it is
19 now well understood because of medical research that the frontal cortex of the human brain –
20 responsible for decision making – is not fully developed in humans until the age of 25. Mr. Aguilar
21 does not offer this to escape culpability, but instead to stress his youth and immaturity as contributing
22 factors to his conduct.

23     Mr. Aguilar faces virtually certain deportation after he completes the sentence on this case.[3] He
24 has no lawful status and stands convicted of an aggravated felony. This results in him being instantly
25 deportable. Moreover, other avenues for immigration relief that would be traditionally available to
26 undocumented persons are foreclosed. Most severely, he is now permanently inadmissible to the

27
28
_____
[3] *See* United States Code, Aliens and Admissibility, 8 U.S.C. § 1227(a)(2)(A)(iii).
DEF'S SENT. MEM.
*AGUILAR*, CR 22–365 CRB

United States, meaning that he is banned from re-entry for the rest of his life. The Government can and will arrange for Mr. Aguilar's removal to Honduras, as they have done in every 'fast-track' prosecution. Mr. Aguilar's dream of a life in America is forever foreclosed.

This is especially significant because Honduras is one of the poorest countries in Latin America and has one of the world's highest murder rates.[4] Per capita income is also one of the lowest in the region, and the standard of living is poverty. This Court is well aware of the violence, absence of opportunity, and upheaval plaguing Honduras. Indeed, Honduran clients, almost without exception, cite the unrelentingly awful conditions as the reason they fled. Many of these clients, like Mr. Aguilar, first attempted to enter the United States lawfully. Rejected at the border and desperate for a new start, Mr. Aguilar felt constrained to do whatever is necessary to escape and attempt a sustainable life in America.

For Mr. Aguilar, deportation to the place he risked his life to flee is the ultimate consequence flowing from the conviction in this case. But he understands and recognizes that it was his conduct that placed him in this predicament. If there is silver lining to his deportation, it is that Mr. Aguilar will be able to see his relatives for the first time in years. Both of his parents are alive and healthy - his mother Amelia is 46 years old, while his father Jose is 53. They both work tending to farmland. Mr. Aguilar also fondly anticipates spending time with all six of his brothers who live in Honduras. Because the highest level of education he completed is the equivalent of sixth grade, Mr. Aguilar will be unable to find professional work. He intends to attempt to find work in the farming sector upon return. Mr. Aguilar conveyed that he had an unremarkable childhood apart from the poverty in which he grew up. He never witnessed domestic violence in his home. Mr. Aguilar never used drugs as a child and only developed an addiction to cocaine shortly after his arrival in Oakland. Mr. Aguilar has not used any drug since his arrest on the Washington case in October 2021. Mr. Aguilar is single, has never been married, and he does not have children. He is in good physical health.

Mr. Aguilar has endeavored to constructively use the time spent in federal custody. Since at least August 2023, Mr. Aguilar has been attending ESL and vocabulary classes at Santa Rita. *See*

---

[4] *See* CIA World Factbook, https://www.cia.gov/the-world-factbook/countries/honduras/

DEF'S SENT. MEM.
*AGUILAR*, CR 22–365 CRB

7

ESL Progress Reports, Exhibit A. He has earned a 4.0 GPA which serves as a reflection of his capacity to learn and excel. He stated there are few classes at the jail taught in Spanish, and so his hope was to learn English with sufficient proficiency so that he can participate in the classes taught in English.

## CONCLUSION

Mr. Aguilar respectfully requests that the Court impose a time-served sentence. He has been in continuous custody for the last 27 months – over two years - and he has served more than one year in actual custody on this case. Taking account for good-time credits, a time-served sentence here is the equivalent of a 14-month prison sentence. Such a sentence reflects the seriousness of this offense and is consistent with achieving the goals of sentencing. Under the circumstances, a time-served sentence is sufficient but not greater than necessary, to accomplish the goals of sentencing under §3553(a). Mr. Aguilar does not have any financial assets and requests that Your Honor not impose a fine.

Dated:      January 24, 2024                      Respectfully submitted,

                                                  JODI LINKER
                                                  Federal Public Defender
                                                  Northern District of California

                                                  _____
                                                            S/
                                                  KARTHIK RAJU
                                                  Assistant Federal Public Defender